# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs August 2, 2016

### IN RE C.C. ET AL.

### Appeal from the Juvenile Court for Jefferson County
### No. 15-00449    Dennis (Will) Roach, II, Judge

_____

### No. E2016-00475-COA-R3-PT-FILED-SEPTEMBER 22, 2016
_____

The Department of Children's Services filed a petition seeking, on the basis of four grounds, to terminate the parental rights of H.C. (Mother) to her four children, C.C., D.C., A.D., and S.D. (collectively the Children). In the same petition, DCS also sought to terminate, on three grounds, the parental rights of B.D., Mother's long-time boyfriend and father of two of the Children, *i.e.*, A.D. and S.D. (collectively the twins).[1] The trial court found, by clear and convincing evidence, three grounds to terminate Mother's parental rights and three grounds to terminate B.D.'s parental rights. By the same quantum of proof, the court found that termination is in the Children's best interest. Mother and B.D. (collectively the parties) appeal. As modified, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Affirmed as Modified; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which ANDY D. BENNETT, J, and J. STEVEN STAFFORD, P.J., W.S., joined.

Kimberly R. Grace, Jefferson City, Tennessee, for the appellant H.C.

John T. Sholly, Knoxville, Tennessee, for the appellant, B.D.

Herbert H. Slatery III, Attorney General and Reporter, and M. Cameron Himes, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

_____

[1] In the same petition, DCS also sought to terminate the parental rights of J.C., the biological father of Mother's other two children, C.C. and D.C. Those rights were terminated in an order entered February 3, 2016. That case is not before us on this appeal.

W. Keith Repass, Dandridge, Tennessee, Guardian Ad Litem.

## OPINION

## I.

The makeup and dynamics of this "family" are somewhat convoluted. Mother and J.C., a convicted sex offender,[2] had two children together, *i.e.*, a daughter, C.C., and a son, D.C. The couple had lived together for approximately two and a half years when they married shortly after D.C.'s birth. Four days after their marriage, J.C. abruptly moved out. Neither pursued a divorce. Soon, Mother began cohabitating with B.D., with whom she had an "open" relationship, one that included other sexual partners. As previously noted, Mother and B.D. had twin daughters. At some point J.C. returned. For a time, the parties, the Children, J.C., and J.C.'s girlfriend all lived in the same house. The parties and the "others" resided in Kentucky. That state's equivalent of DCS was referred to the house sixteen times. It once removed the Children for two days.

Around December 25, 2011, the parties and the Children moved from Clay, Kentucky to Talbott, Tennessee. Mother contends that they moved in order to be closer to her son's diabetic medical care at Vanderbilt University Hospital. Contrary to Mother's assertion, the "distance" factor could not have been the reason for the move. This is because Vanderbilt is approximately two hundred miles from Talbott and approximately one hundred and thirty miles from Clay, Kentucky.[3] In other words, the parties were closer to Vanderbilt when they lived in Kentucky. The evidence indicates that Mother moved to Talbott to be near Jamie D. and Joshua D., a married couple who lived there. Mother had met them through a chat room on the internet. She began a sexual relationship with the couple prior to her family's relocation to Tennessee. That relationship was ongoing at the time of trial in 2015. At trial, Joshua D. estimated that the relationship had lasted for "the better part of five years." Mother and Joshua D. describe their relationship as a "master-slave" relationship that involves BDSM.[4] The

---

[2] Prior to living with Mother, J.C. had been convicted in Michigan of fourth degree sexual assault.

[3] The travel distances stated here are based on Google Maps. *See* https://www.google.com/maps/ (last visited Sept. 7, 2016).

[4] The guardian ad litem states in his brief that BDSM is an "acronym . . . for bondage, discipline, sadism, and masochism" (citing ***State v. Bvocik***, 781 N.W.2d 719, 721 n.2 (Wis. Ct.

2

proof shows that B.D. was aware of the nature of their relationship, as were the Children. Prior to their removal, the Children were in contact with Joshua D. several times a week.

Joshua D. made sex toys. Mother sold them door-to-door. Mother stated that she also earned income by cleaning houses and offices. C.C. testified that Mother engaged in prostitution. Mother denied this claim. Mother challenged C.C.'s credibility. B.D. did not work. He received a Social Security Disability check for gout – a condition which he says has rendered him disabled since 2005. While in Tennessee, Mother was introduced to James C. by a person she met at a gas station. After knowing James C. for about six months, she allowed him to live with the "family" three days a week for babysitting purposes. Shortly thereafter, a restraining order was entered against him after he physically abused the child, C.C.

In October 2012, DCS responded to a referral accusing Mother of physical abuse and psychological harm. DCS case manager Desmond Woodruff found no basis for the allegations, but "other concerns were noted." DCS filed a petition for an order against Mother, J.C., and B.D. In that petition, DCS stated the following:

> The family's home was dirty and cluttered with clothes, trash, and food strewn throughout the home. . . . Woodruff observed gnats and flies in the [C]hildren's bedroom. One of the bathrooms had clothes, trash, and toilet paper in the sink. Also in the sink were gnats, flies, and ants.
>
> There was no food in the home for the [C]hildren. Mother admitted there was no food. . . .
>
> Mother reported that they are past due on this month's rent. DCS had already paid the previous month's rent during a prior case with this family.
>
> The [C]hildren were not enrolled in school at this time. Mother reported that she chose to home school [D.C.] due to his behavioral issues. Mother then decided to home school all of the [C]hildren. However, [D.C.] stated he does not do any school work at home. The remaining children reported that the Mother had only "written out some math problems" for

App. 2010)) "or bondage, domination, sadism, and masochism," (citing **Harrison v. Commonwealth**, No. 1244-14-2, 2015 WL 5945233, at *1 (Va. Ct. App., filed Oct. 13, 2015)).

them to do. Neither the Mother, nor [B.D.], were able to produce any documentation of the [C]hildren's school work when asked[.]

The Mother later showed [case manager] Woodruff paperwork to enroll [C.C.],[A.D.], and [S.D.] into [school] . . . .

On [October 3, 2012], [D.C.] was charged with aggravated assault after attempting to attack a neighbor with a knife. The child, [D.C.], has since been committed to . . . a mental health facility in Chattanooga, TN.

Mother reported that [C.C.] has been in therapy . . . since January 2012, but admitted that the child has not been to her appointments for the last month.

There have been six (6) investigations of this family in 2012 alone for the following allegations: medical maltreatment, nutritional neglect, sexual abuse, physical abuse, environmental neglect, and psychological harm. The last DCS case closed in Jefferson Juvenile Court on [September 18, 2012].

(Paragraph lettering in original omitted.) On October 15, 2012, the trial court granted DCS's petition. The subsequent order required Mother and B.D. to (1) enroll the girls in school and D.C. in an accredited home school; (2) clean the home; (3) develop a home cleaning system; (4) create a budget; (5) ensure C.C. attends therapy appointments; and (6) report weekly to DCS. The Children were removed from the home on October 26, 2012, for reasons of environmental neglect, housing issues, medical neglect, and failure to enroll the Children in school. At that time, the Children faced several medical problems. C.C., A.D., and S.D. had lice and flea bites, among other things. D.C., who has a rare form of diabetes, was placed in a residential facility to monitor his high blood sugar, which was measured at 600. The Children faced mental health issues. They all have mood disorders. C.C. and A.D. threatened suicide. The twins had severe nightmares. D.C. had post-traumatic stress disorder, an immune-anxiety disorder, and a propensity for violent outbursts.

The trial court adjudicated the Children dependent and neglected on March 19, 2013. On May 27, 2015, DCS filed a petition to terminate parental rights. DCS sought

to terminate the parental rights of the parties on three of the same grounds – abandonment by failure to provide a suitable home, pursuant to Tenn. Code Ann. § 36-1-113(g)(1) (2014), -102(1)(A)(ii) (2014); persistence of conditions, pursuant to Tenn. Code Ann. § 36-1-113(g)(3); and mental incompetence, pursuant to Tenn. Code Ann. § 36-1-113(g)(8). DCS sought to terminate Mother's parental rights for a fourth ground – abandonment by willful failure to support, pursuant to Tenn. Code Ann. § 36-1-113(g)(1), -102(1)(A)(i), (D). The trial court found, by clear and convincing evidence, grounds to terminate Mother's parental rights for persistence of conditions, as well as abandonment for failure to support and failure to provide a suitable home. By the same evidentiary standard, the trial court found grounds to terminate B.D.'s parental rights for abandonment for failure to provide a suitable home, persistence of conditions, and mental incompetence. The trial court also found, clearly and convincingly, that termination of the parental rights of the parties is in the Children's best interest. The parties appeal.

## II.

Mother raises one issue: "Whether the [t]rial [c]ourt erred in terminating [her] parental rights on the grounds of abandonment by failure to support, abandonment by failure to provide a suitable home, and persistent conditions."

B.D. raises the following issues, which we reprint verbatim from his brief:

> Did the trial court err by finding that statutory grounds existed to terminate the parental rights of [B.D.]?
>
> A. Was sufficient evidence presented to find that [B.D.] failed to provide a suitable home for his children?
>
> B. Was sufficient evidence presented to find that the same conditions persisted that originally resulted in the [C]hildren being brought into custody?
>
> C. Was sufficient evidence presented to find that [B.D.] is mentally incompetent?
>
> Did the trial court err by finding it was in the Children's best interest to terminate the parental rights of [B.D.]?

\*      \*      \*

5

Did the trial court err by terminating both parents' rights, when Tennessee law allows for the termination of only one parent's rights when their circumstances are different?

(Paragraph numbering and capitalization in original omitted.)

## III.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

6

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

The Supreme Court has recently delineated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

B.D. questions whether the trial court erred by terminating both his and Mother's parental rights "when Tennessee law allows for the termination of only one parent's rights when their circumstances are different." (Capitalization and emphasis in original

omitted.)  Citing *In re Audrey S.*, 182 S.W.3d at 838, he argues that "[i]n most all areas on [sic] consideration, the circumstances of [B.D.] are substantially different from the circumstances of [Mother]."  He asserts that, different from Mother, he only has parental rights to the twins, paid support, faces the ground of mental incompetence on appeal, and has a more "easy going" approach to parenting.

We recognize that termination of parental rights cases require "individualized decision making" due to "the gravity of [the] consequences."  *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *7 (Tenn. Ct. App., filed May 15, 2009) (citation and internal quotation marks omitted).  DCS must establish that a ground for termination exists against each parent and that termination of each parent's parental rights is in the best interest of the children.  Tenn. Code Ann. § 36-1-113(c).  However, the relevant facts of *In re Audrey S.* differ significantly from the case now before us.  There, of the two fathers involved, one was the mother's high school boyfriend whom she lived with briefly before their relationship ended in 1995.  *Id.* at 849.  The other was a man the mother dated briefly in 1998.  *Id.* at 851.  Both fathers filed a petition to terminate the mother's parental rights in 2003.  *Id.* at 856-57.  At that time, the mother, who had been in and out of incarceration for most of her children's lives, had begun a lengthy sentence for especially aggravated kidnapping and aggravated robbery convictions.  *Id.* at 855.  Neither father was involved in those crimes.  *Id.*  In that case, the mother's circumstances were different from those of the fathers.

Here, Mother and B.D. have been in a relationship and lived together for well over a decade.  Together, they moved in 2011 with the Children to Tennessee.  The Children were removed from a house they shared.  The two continued to live together through the time of trial, despite several changes in their residence.  The trial court found only two grounds for termination had been established against *both* Mother and B.D. – failure to provide a suitable home and failure to remedy persistence of conditions.  DCS must establish proof of these grounds against each individual parent.  However, given Mother and B.D.'s living situation during the relevant time period, as well as issues that caused the Children's removal from the home, we disagree that B.D. and Mother generally had "substantially different . . . circumstances" as it relates to these two grounds.

## V.

### A.

The trial court concluded as follows with regard to whether Mother abandoned the Children through willful failure to support in the four consecutive months immediately preceding the filing of the petition to terminate parental rights:

> [Mother] was aware of her duty to pay support, as she was under court order to do so. She was aware of the consequences of her failure to support, as she signed the Criteria for Termination of Parental Rights. [Mother] had the capacity to provide support and had no justifiable excuse for not paying support. [Mother] was able to work during the four months prior to the filing of termination, and did in fact work as a house cleaner and a manufacturer of sex toys. [Mother] has no justifiable excuse for her failure to support.

Our review of the record demonstrates that the evidence does not preponderate against the trial court's factual findings on this ground. From the above facts, the trial court concluded the ground of abandonment by failure to support was proven against Mother by clear and convincing evidence.

Termination is proper if the parent abandons the child. Tenn. Code Ann. § 37-1-113(g)(1). Tenn. Code Ann. § 36-1-102(1)(A)(i), (D) defines abandonment as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights . . . that the parent . . . [has] willfully failed to support or [has] willfully failed to make reasonable payments toward the support of the child;
>
> \*　　\*　　\*
>
> For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child[.]

As this court previously stated, "[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at \*5

9

(Tenn. Ct. App., filed Nov. 25, 2003) (citations omitted). Further, "[t]he willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct." *Id.*

In the present case, Mother signed the Criteria and Procedures for Termination of Parental Rights on November 19, 2012. The document outlined her duty to make support payments, as well as the consequences for failing to do so. In March 2013, the trial court had ordered her to begin paying monthly support of $50 for each child, as well as $60 in arrears. On October 21, 2013, by court order, Mother was referred to the Tennessee Child Support Employment and Parenting Program (TCSEPP), which aims "to help non-custodial parents overcome problems which have caused or may cause them to be unable to pay child support regularly," according to the order. Mother's TCSEPP case was closed on March 13, 2014 because of her "fail[ure] to job search or complete assignments." Mother was "not eligible for re-enrollment." Prior to filing the termination petition, Mother had made less than one month's full support payment. As of September 30, 2015, she owed $6,198.48 for child support arrears. She was held in contempt in October 2015 for non-payment of support.

Mother testified that she earned about $200 to $450 each week cleaning houses after the Children were removed from her home. However, she could not produce proof of her legal income due to, she said, her clients' request for privacy and the direct application of her earnings to pay her bills. Mother later got a job with home health agency AllCare, through which child support could be garnished from her wages. B.D. received $930 each month in disability payments. His testimony indicated that, together, their monthly household expenses totaled about $1,200 – $650 for rent, $112 for cable, $112 car payment, $67 car insurance payment, $85 for a cell phone, and $200 for utilities. He had a $100 child support payment for the twins garnished from his disability benefit.

Although their reported household income exceeded their reported expenses, Mother denies that her failure to pay support was willful. At trial, she testified that she made child support payments whenever she was able. She states in her brief that she experienced medical issues with Bell's Palsy and a hormonal imbalance, both of which "prevented her from being able to work or significantly limited her ability to work." She provided no documentation of these illnesses. Mother also argues in her brief that "[a]t no point in the record did DCS provide evidence of the fact [Mother] had money and rather than giving it to her children, she willfully kept it for herself[.]" This is not the standard. Instead, we find Mother was aware of her duty to provide support payments,

had the capacity to provide support, made no attempt to pay more than token support, and had no justifiable excuse for not providing the support. ***In re Adoption of Muir***, 2003 WL 22794524, at \*5. Taking all of these factors into account, we hold that the evidence clearly and convincingly demonstrates Mother willfully failed to support the Children.

**B.**

For both of the parties, the trial court made separate, but nearly identical, findings of fact and conclusions of law on the ground of abandonment by failure to provide a suitable home, which we present together. For both, the trial court held that this ground was proven by clear and convincing evidence based on the following:

> The [C]hildren were removed from the home of [the parties] and placed into DCS custody on October 26, 2012. The Jefferson County Juvenile Court adjudicated the [C]hildren dependent and neglected and found that DCS had made reasonable efforts to prevent removal of the [C]hildren from the home. The Court finds that DCS made reasonable efforts to assist [Mother] in establishing a suitable home; however, [the parties] did not make any reasonable efforts to provide a suitable home. Case Manager Susan Moyers made reasonable efforts to assist [the parties] in finding a home during the four month period from October 26, 2012 until February 26, 2013, by working diligently to find a home for the [parties] in both Hamblen and Jefferson counties. The [parties] were subsequently evicted from their mobile home, and temporarily moved into a motel in Cocke County before finally settling at their current address. As of August 2014 the home of the [parties] had one bed in the house, and as of May 2015 two beds were in the home, which remains an inadequate number for six individuals. Finally, and most noteworthy in the eyes of this [c]ourt, three years from the date of removal, and in spite of a permanency plan requirement allowing access to their home, at the final home visit on October 28, 2015, the DCS caseworker was denied access to the home. However, when the door was opened by [B.D.], the caseworker was able to notice that the floor was filled with trash. Three years have passed since removal, and based on the evidence at hand, this court is clearly convinced that the home of [the parties] remains unsuitable for [the]

11

[C]hildren. Furthermore, the [c]ourt has no confidence that it will become suitable anytime in the near future.

The evidence does not preponderate against the trial court's factual findings for this ground.

Tenn. Code Ann. § 36-1-102(1)(A)(ii) explains abandonment as a result of failure to provide a suitable home:

> [F]or a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] made no reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Moyers worked with the family the first four or five months the Children were in State custody. She described that, at the time of removal, "[t]he trailer itself was really rough," had only "sparse" furnishings, and "was in disarray." She stated the utilities had been off for a time. Mother agreed that, at this time, the house was in "poor condition," but stated the Children were at a neighbor's home. DCS provided funding to help the family move into the trailer, but declined Moyers' request for funding for the parties after the Children were removed. The parties were evicted in January 2013. They next lived in a hotel until they were evicted later that spring. Moyers tried unsuccessfully to get the parties into housing. "[Mother] didn't have . . . a form of identification. She didn't have a driver's license and there was a problem with getting her [b]irth [c]ertificate out of Kentucky," Moyers stated at trial. The housing authorities required these items. Moyers said she also reached out to others in the community to get housing for the family. The parties could not afford rent for the housing options Moyers presented. Katie Ferguson, DCS case manager for this matter from March 2013 to June 2014, worked with the parties through the Coalition for Homelessness to secure housing for them, but those efforts, too, were unsuccessful. The parties moved into their current home in September 2013 with the help of Youth Villages, a contract agency with DCS.

12

The condition of the parties' home remains unsuitable. It does not have an adequate number of beds. Trash appeared to cover the floor of the home during an October 2015 DCS home visit. Mother denied this. She stated that the items were bags of Halloween decorations or leaves. Jan Carmella Schoonover, the DCS case worker present during that home visit, testified to observing, from the doorway of the home, the smell of decaying food.

The parties each argue that termination on this ground is improper because some of the problems with the current home could be "easily remedied by a quick trip to the thrift store or Big Lots" to get some furniture for the Children. The Children had been in custody for three years by the time of trial. The parties had been in their home for about two years. Their unwillingness to make the home suitable for the Children in that time when, according to them, some of the problems could have been easily resolved, "demonstrate[s] a lack of concern for the [C]hild[ren] to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child[ren] at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii).

In his brief, B.D. asserts that "[p]art of the suitability of a home for [B.D.]'s children is stability which is shown by the fact that he lived at the same home for almost three years prior to the October 30, 2015 trial date."[5] This assertion is not supported by the record. Instead, the record indicates, that on October 26, 2012 – about three years before trial – the Children were removed from a trailer where the parties resided in White Pine from which they were later evicted. At the time of trial, B.D. lived with Mother in a home in Morristown.

Mother argues on appeal that the home was suitable because it was free of drugs and domestic violence and was not "uninhabitable to the point the building should be condemned." Again, this is not the standard. We find DCS put forth reasonable efforts to help the parties establish a suitable home for the Children, though the parties failed to provide a suitable home and demonstrated a lack of concern for the Children to such a degree that it seems unlikely either parent will be able to provide a suitable home for the Children at an early date. For the reasons stated above, we find, by clear and convincing

---

[5] B.D.'s brief also states, "[B.D.] *and his wife* have lived at the same residence . . . for about three years as of [October 30, 2015]." (Emphasis added.) Shortly thereafter, the brief states "[*Mother*] *and* [*B.D.*] *are not now married, nor have they ever been*." (Emphasis added). We found no other suggestion in the record or the appellate briefs that B.D. is married. It is unclear whether reference to B.D.'s "wife" in his brief is simply an error. The parties are in an "open" relationship. Schoonover stated that, during a visit to their home, she observed that a person appeared to be living in one of the bedrooms intended for the Children.

evidence, grounds to terminate the parental rights of both the parties for abandonment due to failure to provide a suitable home.

## C.

The trial court found, by clear and convincing evidence, that termination was proper for both the parties under Tenn. Code Ann. § 36-1-113(g)(3) due to their failure to remedy persistent conditions. In making this finding, the court relied on the following facts with regard to its individual holding against them:

> The [C]hildren were removed from the home of [the parties] more than six (6) months prior to the filing of the Petition for Termination of Parental Rights. The [C]hildren were removed for, among other things, environmental neglect, housing issues, medical neglect, and failure to enroll the [C]hildren in school. At the time of removal, [D.C.], a Type I and Type II diabetic, was undergoing life threatening blood sugar issues, the home of the [parties] was in disarray, the [parties] were on the verge of being evicted, and all three female children had lice and flea bites. For the reasons mentioned above . . . the [c]ourt has found that the [parties] have not provided a suitable home for the [C]hildren and have not shown that such a home will or can be provided at any time in the near future. [D.C.] requires a high level of medical care due to his diabetes, and all the [C]hildren have mood disorders which require monthly management and appointments. However, both [of the parties] have displayed a significant lack of interest in the well-being of their [C]hildren as evidenced by their failure to attend the vast majority of the [C]hildren's medical appointments while in custody. This lack of concern on the part of the [parties] leaves the court in a position of disbelief as to the probability that the most basic and pressing medical and psychological needs of the [C]hildren will be met in the near future if returned to the [parties].

With regard only to Mother, the trial court concluded the following:

> The testimony has also shown that in addition to the conditions existing at the time of removal, another issue has

14

come to light regarding the personal affairs of the family. [Mother] is in a master-slave sexual relationship with an individual named [Joshua D.]. This in addition to being married to [J.C.], and living with [B.D.]. [Mother] is the "Slave", and [Joshua D.] is the "Master." Until two years ago, or 2013, [Mother] was also working with [Joshua D.] as a door-to-door "salesman" who assisted him in his business of marketing sex toys. She would "demonstrate" to potential clients how the toys worked. The testimony has also established that the [C]hildren were both exposed to, and took note of this lifestyle. The [c]ourt has found [Mother]'s testimony to lack credibility when questioned about the lack of attendance at medical appointments, the condition of her home, her failure to allow DCS entry to examine the home in August of 2015, and the multiple interpersonal conflicts she has had with various providers, doctors' offices, and DCS caseworkers.

As to B.D., the court also found, "[he] has borderline intellectual functioning, and the evidence would show he has taken very little interest in the medical and psychological conditions of his [C]hildren, or the master/slave sexual relationship of [Mother]." With regard to the parties, the trial court made the following individual findings that we present together: "Finally, and most tellingly, after three years of removal, and in the face of everything mentioned above, [the parties each] refuse[ ] to acknowledge a problem with [their own] parenting skills or those of [their partner]." The court found that both of them "continue[ ] to shift responsibility for the problems [they each face] to [the Children] and DCS." The trial court concluded that DCS made reasonable efforts to help the parties remedy those conditions, but that there is little chance the conditions will be remedied soon so that the Children can be returned safely home.

The evidence does not preponderate against the trial court's findings of fact. Tenn. Code Ann. § 36-1-113(g)(3) authorizes termination of parental rights when:

The child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and;

(A) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and

15

which, therefore, prevent the child's safe return to the care of the parent[s] . . . still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent[s] . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The parties each put forth several reasons that DCS failed to establish that the conditions that led to the Children's removal have persisted. First, the parties each assert that the problems with housing had been remedied. Based on our analysis in the prior section, we disagree and reiterate our holding that the parties have failed to provide a suitable home for the Children.

B.D. also asserts that the issue of "[m]edical neglect is inapplicable to [him], nor is it something that [he] is in a position to address" because he is not the biological father of D.C. and C.C. and "has no legal responsibility for their care." We strongly disagree that this issue is inapplicable to B.D. His biological daughters, S.D. and D.D., faced several health problems at the time of removal. Both had impacted ear wax that required treatment by several medical professionals and caused speech and hearing problems. His daughters also had vision problems. M.H., foster mother of C.C., A.D., and S.D. from October 27, 2012 until August 14, 2015, testified that when the girls came to her home "they were very sick" with "pretty severe colds and coughs," as well as "bedbug bites, lice, and UTIs." M.H. further testified that "[e]motionally they were pretty devastated by their circumstances." The twins regularly had trouble sleeping due to severe nightmares. At one point, A.D. threatened suicide, prompting M.H. to take her to the hospital. At trial, B.D. stated that when the twins were taken into custody "they were sick," but, so far as he was aware, they had no problems. While in custody, the twins had regular psychiatric appointments. M.H. created and maintained an online calendar of their medical appointments, along with C.C.'s, that she shared with the parties. B.D. attended one medical appointment while the twins were in custody. At trial, B.D. said he often was unable to attend "[b]ecause most of the time I was working," though he testified to being employed for only nine months of the three years the Children were in custody. He was aware of the online calendar, but stated he was often unaware of the appointments.

16

When asked to describe A.D. and S.D.'s medical needs, B.D. responded "[a]s far as I know, they just see a psychiatrist" because of "them being taken from us."

In response to the condition of medical neglect, Mother asserts that she knows a great deal about D.C.'s rare form of diabetes. Still, when D.C. entered custody, his blood sugar level was 600. He told DCS either he or C.C. often had to administer his medicine without adult supervision. Mother was generally absent from the Children's medical appointments. She attributes this to problems with transportation, being asked to no longer attend certain appointments after being perceived as "combative," being "refused access to the appointments" by her daughter, C.C., or her own medical problems. The trial court found Mother's testimony about her absence at these appointments lacked credibility. We accord "considerable deference" to the trial court on issues of a witness's credibility. *In re Adoption of S.T.D.*, 2007 WL 3171034, at *4. We note, too, that Mother's presence was, at times, counterproductive. For example, at a psychiatrist appointment for S.D., Mother became so belligerent that the psychiatrist said he would no longer see S.D. as a patient.

Mother also challenges this ground as it relates to her "BDSM relationship with [Joshua D.] and her participation in the sex toy business[.]" Mother stated in her brief:

> It is unclear whether the [C]hildren actually saw [Mother] and [Joshua D.] engaging in BDSM activities, or if they found the sex toys [Mother] sold and drew their own conclusions. However, the [C]hildren did have some knowledge of what BDSM activities were and did see [Mother] at some point with the sex toys, either in transporting them for a sales party or by making said items.

At the time of the removal, the Children were ages twelve, ten, and six. Testimony at trial indicated aspects of Mother's alternate lifestyle had a negative impact on the Children. Specifically, M.H. testified as follows[6]:

---

[6] The trial court allowed this testimony under Tenn. R. Evid. 803(25), which provides that the hearsay rule does not exclude the following:

> Provided that the circumstances indicate trustworthiness, statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse or neglect, offered in a civil action concerning issues of . . . termination of parental rights pursuant to Tenn. Code Ann. § 37-1-147 and Tenn.

17

[M.H., foster mother:] The twins stated that they had witnessed the making of whips and floggers and had been actually physically abused with one of [Mother]'s paddles that she uses for whatever purpose that they [are] made.

[Attorney for DCS:] Okay. Did they say who made those?

[M.H.:] They said that Josh [D.], Jamie [D.], [Mother], and [B.D.] sit around and make . . . the paddles and whips and stuff, yes.

* * *

[M.H.]: There was paddles [sic] – metal paddles that was used that the kids claimed – that the twins had stated that [C.C.] would hide them in the bathroom wall because they would use them on the kids and that [C.C.] busted out a bathroom wall in one of the homes that they lived in – the twins told me this – and that [C.C.] would place the paddles to hide them from [Mother] and whoever – and Jamie, who she had stated – they had stated would hit them with them.

M.H. further testified that she understood the paddle at issue was a sex toy. On August 8, 2013, the trial court ordered Joshua D. and Jamie D. to "have absolutely no contact" with the Children. However, C.C. testified that Mother told her "no matter what anybody says, [Jamie D. and Joshua D.] are still going to be a part of our lives." M.H. reported that, Joshua D. occasionally attended visits with the Children or drove Mother to visits or the Children's appointments. Joshua D. testified at trial that his relationship with Mother was ongoing. Mother remained married to J.C., a registered sex offender, who she said "always had an open invitation" to visit. B.D. was aware of these relationships.

The above evidence establishes, clearly and convincingly, that neither of the parties remedied the conditions that led to the Children's removal. Their actions further indicate little likelihood the conditions will be remedied at an early date. Should the

Code Ann. § 36-1-113. . . . Declarants of age thirteen or older at the time of the hearing must testify unless unavailable as defined by Rule 804(a); otherwise this exception is inapplicable to their extrajudicial statements.

18

Children continue a relationship with the parties it would greatly diminish their chance of early integration into a safe and stable home. For these reasons, we find cause to terminate the parties' parental rights under this ground.

**D.**

The court found, by clear and convincing evidence, cause to terminate B.D.'s rights on the ground of mental incompetence, pursuant to Tenn. Code Ann. § 36-1-113(g)(8). The court stated, "[B.D.] is incompetent to adequately provide for the further care and supervision of his two children." The court added that "[B.D.]'s mental condition is presently so impaired and is so likely to remain so that it is unlikely that he will be able to assume or resume the care of and responsibility for his children in the near future." In reaching its holding, the court relied in part on a deposition by Dr. Scott Swan, a licensed clinical psychologist at the University of Tennessee Psychological Clinic. On appeal, B.D. objects to the use and consideration of Dr. Swan's deposition and asks for it to be excluded. He suggests Dr. Swan's curriculum vitae and the psychological evaluation are not in the record. B.D. is wrong on this part. B.D. also asserts that Dr. Swan, who was deposed, "is not the person who met with, interviewed, or tested the [parties]," pointing out that, instead, this was done by a student clinician, Sam Manring, under Dr. Swan's supervision. B.D. further asserts on appeal that Dr. Swan did not review any of the documents filled out by the parties, the parties' records received by third-party sources, or the results of the tests used to create the psychological evaluation of the parties, but that he only reviewed and revised Manring's evaluation. Similarly, as part of a motion filed September 23, 2015, B.D. declined to stipulate that the psychological evaluation was admissible. Instead, he stated that the psychological report was hearsay because the person who signed it was not the person who interviewed the parties and that it would be wrong to admit it without offering an opportunity to cross examine. The relevant portion of the motion did not give any supporting legal argument.

We note that during the November 3, 2015 deposition of Dr. Swan, at which B.D.'s counsel was present, Dr. Swan explained how his student clinicians and supervising psychologists conduct an evaluation. Counsel for DCS then stated regarding Mother and B.D.'s psychological report, "We'd move to have this as the State's second exhibit." There was no objection by B.D.'s counsel. At trial, the court later allowed Dr. Swan's deposition into evidence because both parties had been present and had the opportunity to cross-examine. The decision of whether to admit evidence is within the discretion of the trial court. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999) (citing *Seffernick v. Saint Thomas Hosp.*, 969 S.W.2d 391, 393 (Tenn. 1998)). "Appellate courts will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently

19

with the substantial weight of the evidence." *White*, 21 S.W.3d at 223 (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999)).  Here, before admitting the deposition, the trial court determined both sides were present and had an opportunity to cross-examine.  At trial, B.D.'s counsel did not object to the court's holding on this issue.  On appeal, B.D. does not assert a legal argument supporting the exclusion of the deposition.  We find no abuse of discretion.

The trial court found as follows in holding, by clear and convincing evidence, grounds to terminate B.D.'s parental rights due to mental incompetence:

> According to the deposition for proof, [B.D.] is borderline intellectual functioning, yet suffers from no diagnosis, and while calling into question [B.D.]'s ability to parent, Scott Swan, Ph.D., in his deposition for proof, ultimately stated it was "difficult to say" whether [B.D.] could adequately parent.  However, Dr. Swan also stated that [B.D.] has failed to take responsibility for the family problems, and that [B.D.] continues to blame his children and DCS for the custody issues.  Dr. Swan also stated that [B.D.] would most likely fare better as a parent if he could have another adult be there to help.  This [c]ourt would normally be extremely hesitant to find that there is clear and convincing evidence of mental incompetence when an expert has left the matter open to question; however, the [c]ourt finds that the totality of the testimony and evidence before it leaves little to question.

The trial court went on to find "[B.D.] is unable to understand and appreciate the ongoing medical and psychological issues faced by his children."  The court cited B.D.'s failure to take responsibility for the twins' removal into State custody, his inability to name either of the twin's psychological diagnoses, and his failure "to attend the overwhelming majority of the medical appointments of his children."  Next, the trial court found that B.D's "parenting record . . . speaks for itself, and to hold otherwise would fly in the face of history and the evidence in this case."  In support of this position, the court stated:

> The [C]hildren were removed from his home at one time in Kentucky.  At the time, [B.D.] lived in the same home in Kentucky with [Mother], her husband (a sex offender), and all of the [C]hildren.  [B.D.], while bringing home a modest income due to his disability, has allowed [Mother], who has never been divorced from her husband in Kentucky, to

20

> maintain before his children an open master/slave sadomasochistic relationship while in Tennessee. [B.D.] appears to be managed by [Mother] to such a degree that the [c]ourt cannot imagine [B.D.] as parenting in any other form than that of a bystander. When [Mother] shut the door at the DCS home visit, [B.D.] stood by and allowed it to happen. When [Mother] is ordered to engage in sexual affairs with [J.D.], [B.D.] does not object.

Finally, the trial court found B.D.'s "borderline intellectual functioning . . . was also exhibited in more subtle, yet telling ways." The court cited B.D's inability to recall certain information from 2013, such as how long he lived at the White Pine residence, its address, or the last name of James C., the babysitter, who lived in his family's home. The court also stated that "the evidence has shown [B.D.] has little emotional connection with his daughters, and is relatively unengaged at visits."

Previously, we have declined to terminate parental rights under Tenn. Code Ann. § 36-1-113(g)(8) where "both psychologists opined that [f]ather and [m]other could learn to competently parent with intensive, long-term intervention." *In re Christopher S.*, No. E2012-02349-COA-R3-PT, 2013 WL 5436673, at *17 (Tenn. Ct. App., filed Sept. 27, 2013). Even when a parent had been diagnosed with a mild intellectual disability, we have declined termination on this ground when the parent "had successfully obtained vocational training, maintained employment, utilized public transportation, maintained a household, and secured a competent support system." *Id.* (citing *State, Dep't of Children's Servs. v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *14 (Tenn. Ct. App., filed May 30, 2002)). For this ground, we have found termination appropriate when expert testimony revealed that a parent suffers from a "lifelong condition" in which the parent "functioned in such a low range that *no amount of training, education, or counseling* could bring him up to the level where he could parent these children." *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008) (internal quotation marks omitted; emphasis added).

In the present case, Dr. Swan described B.D. as "somewhat simplistic and concrete in his attitudes about parenting." He questioned B.D.'s "ability to parent these children specifically." Significantly, however, Dr. Swan added, "it would be difficult to say whether he would or would not be capable. . . . *I take issue with saying . . . that he has no ability [to parent] because of his cognitive functioning because it's in this borderline range.*" (Emphasis added.)

We are aware that the trial court cited various examples to indicate B.D.'s "borderline intellectual functioning" and perceived inability to "parent[ ] in any other form than that of a bystander." However, while the evidence does not preponderate against the trial court's *factual findings* on this ground, we disagree that the totality of the evidence shows this ground clearly and convincingly. As can be seen, Dr. Swan was ambivalent on this issue. It is important to recognize that the issue is *not* whether B.D. has impaired cognitive functioning. He clearly does. However, the real issue is whether this impairment adversely affects his ability to parent his children. On this latter issue, we cannot say, clearly and convincingly, that it does. We hold, *as a matter of law*, that the evidence is not sufficient to, clearly and convincingly, show that B.D.'s parental rights should be terminated based upon mental incompetence. *See **In re Carrington***, 483 S.W.3d at 524 ("In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness.").

## VI.

After finding that statutory grounds warrant termination of the parties' parental rights, we now focus on whether termination is in the Children's best interest. When considering the issue of "best interest," we are guided by the following statutory factors:

> (1)  Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2)  Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3)  Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4)  Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d at 499 (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

The trial court found that termination of both the parties' parental rights was in the best interest of the Children. It made a nearly identical finding that, although the parties have "stabilized [their] home situation, inasmuch as [they have] resided in the same home for a number of years, the evidence does not show that [their] home is suitable or safe for minor children." As to Mother, the court found that she "has been and is unlikely to

23

make a lasting change in her parenting pattern." She maintained visits and a relationship with the Children. Still, she "continues to deny the majority of the responsibility for the conditions which led to removal, and has consistently struggled against the efforts of those who would could [sic] have helped her had she only been willing." The court stated again that B.D. "functions at a low intellectual level." It also found he "has not made a lasting change in his parenting skills." Despite maintaining a relationship with the Children, "the evidence has shown that during his visits he has been generally unengaging" with them. Finally, B.D. "continues to deny the majority of the responsibility for the conditions which led to removal." The Children have been in foster care for several years. The trial court found the Children are "thriving" there. They have received "consistent," "continuing psychological and medical care." The court concluded that "[t]o disrupt their healthy and stable lifestyle only to place them back in the custody of their parents would likely have a devastating effect on both their mental and physical well-being." The evidence does not preponderate against the trial court's factual findings.

When the Children were taken from the parties' home, they had several health problems. While the Children were in custody, Mother did not make an adjustment of circumstances, conduct, or conditions such that it would be safe or in the Children's best interest to return them to her home. Most notably, she failed to provide a suitable home, failed to pay more than token support, and failed to attend most of the Children's medical appointments.

B.D. has also failed to make an adjustment of circumstances, conduct, or conditions to make it safe and in the twins' best interest to be in his home. In his brief, he provides several examples to indicate that he is engaged with the twins. However, according to M.H., his phone conversations with the twins generally lasted only a few sentences. She also stated that he sometimes failed to distinguish between them. He had little knowledge of the twins' medical needs. B.D. testified that he did not talk with M.H. about his daughters or their medical appointments, but instead relied on Mother for information. We note that B.D. did have his disability check garnished to provide support and had bought the twins school supplies. Although we declined to find that DCS established a ground for termination due to his mental incompetence, we note that Dr. Swan questioned B.D.'s ability to parent the twins independently because of limited intellectual functioning. Dr. Swan testified during the deposition that B.D. "would need some kind of ongoing assistance" such as "another parenting figure in the home."

On appeal, Mother maintains that, as it relates to her, the "main component" of the trial court's best interest determination "is [her] alternative lifestyle." She adds that, "While BDSM and slave/master relationships might seem unconventional to the average

person, a reasonable person could not automatically conclude that BDSM and selling adult toys is equivalent to being an unfit parent." The testimony at trial revealed the adult toys were made in front of and used to discipline the Children. In her own brief, Mother states "the [C]hildren did have some knowledge of what BDSM activities were and did see [Mother] at some point with the sex toys[.]" Further, the trial court ordered Joshua D. and Jamie D. to have no contact with the Children, though C.C. testified that Mother told her they would be in their life "no matter what." Joshua D. testified at trial that his relationship with Mother was ongoing. Finally, Mother remained married to J.C., a registered sex offender to whom she gave "an open invitation to visit." Mother suggests in her brief that "DCS was reluctant to assist [her] and [B.D.] because of their alternative lifestyle[.]" On the contrary, we find DCS worked with both Mother and B.D. to help them establish a home, ensure that the home was suitable, execute and implement a permanency plan, facilitate visitation, and attend the Children's medical appointments.

C.C. testified that she wishes "to move on with [her] life." C.C. also stated that she "hope[s] we get adopted" by her current foster home. Trial testimony indicates S.D., A.D., and D.C. also wish to be adopted. They are currently placed with R.C. and her husband, who wish to adopt them. R.C.'s trial testimony indicated that she is knowledgeable about the Children's unique health and treatment needs. With these factors in mind, we affirm the trial court's holding, by clear and convincing evidence, that termination of the parties' parental rights is in the Children's best interest.

## VII.

We modify the order of the trial court by excluding its holding that termination of B.D.'s parental rights is proper under Tenn. Code Ann. § 36-1-113(g)(8). The judgment of the trial court is affirmed as modified. The costs on appeal are assessed to the appellants, H.C. and B.D. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE

25